ERNEST GALVAN – Cal. Bar No. 196065 *
LESLIE C. MEHTA – Cal. Bar No. 258512 *
BLAKE THOMPSON – Cal. Bar No. 255600 *
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:         egalvan@rbbg.com

LANCE WEBER – N.H. Bar No. 19942 *
HUMAN RIGHTS DEFENSE CENTER
Post Office Box 2420
Brattleboro, Vermont  05303-2420
Telephone:     (802) 579-1309
Facsimile:     (866) 228-1681
Email:         lweber@humanrightsdefensecenter.org

DANIEL J. POCHODA – No. 021979
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, Arizona  85014-5077
Telephone:     (602) 650-1854
Facsimile:     (602) 650-1376
Email:         dpochoda@acluaz.org

* *Admitted to Practice* Pro Hac Vice

Attorneys for Plaintiff PRISON LEGAL NEWS

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER,<br><br>                    Plaintiff,<br><br>          v.<br><br>PAUL BABEU, individually and in his official capacity as Sheriff of Pinal County, Arizona; PINAL COUNTY, ARIZONA; Sergeant TONYA DELGADO, in her individual and official capacities; Detention Aide ALYSSA ROMERO, in her individual capacity; Detention Aide LAURENDA HENSLEY-SALISBERRY, in her individual capacity; Detention Aide CHERYL MCBIRNIE, in her individual capacity; Detention Aide JOHN JOHNSTON, in his individual capacity; Detention Aide LAUREN MCVICKER, in her individual capacity; LORETTA VALDEZ, in her individual capacity; DALTON GAY, in his individual capacity; ERICA CHAVEZ, in her individual capacity; DENA KELLY, in her individual capacity; Sergeant AMADO MARTINEZ, in his individual and official capacities; Sergeant LEONARD ARNOLD, in his individual and official capacities; Training Specialist DAVID LINDERHOLM, in his | Case No. CV 11-01761-PHX-GMS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION**<br><br>Judge:   Hon. G. Murray Snow<br><br>**ORAL ARGUMENT REQUESTED** |

1  individual and official capacities; Lieutenant
   FRANCES HAWKINS, in her individual and
2  official capacities; Lieutenant DENNIS
   RUSHING, in his individual and official
3  capacities; Lieutenant MATTHEW HULL, in his
   individual and official capacities; Lieutenant
4  DARREN RUSHING, in his individual and official
   capacities; Lieutenant VERNITA GANT, in her
5  individual and official capacities; Lieutenant
   MICHELE MCNEELY. in her individual and
6  official capacities; Lieutenant GILBERT HOYOS,
   in his individual and official capacities; Captain
7  TERRY JOHNSON, in his individual and official
   capacities; Captain JAYME VALENZUELA, in
8  his individual and official capacities; Captain
   RUBEN MONTAÑO, in his individual and official
9  capacities; and Deputy Chief JAMES KIMBLE, in
   his individual and official capacities,

10
                    Defendants.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[638676-8]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

STANDARD FOR SUMMARY JUDGMENT ..................................................... 1

STATEMENT OF UNDISPUTED FACTS......................................................... 1

    A.    Defendants' Censorship of Plaintiff's Publications and
Correspondence ........................................................................ 2

        1.    Newspaper and Magazine Ban.................................... 3

        2.    Postcard and One-Page Letter Policy.................................... 4

        3.    Approved Book Vendors.................................... 4

    B.    Lack of Notice to Plaintiff Or Its Subscribers................................ 4

    C.    Defendants Changed Their Formal Policy But Continued Their Illegal
Conduct After This Lawsuit Was Filed........................................ 5

ARGUMENT ................................................................................................ 5

I.    DEFENDANTS VIOLATED PLAINTIFF'S SPEECH RIGHTS UNDER
THE FIRST AMENDMENT AND THE ARIZONA CONSTITUTION ................ 5

    A.    There Is No Valid, Rational Connection Between Defendants'
Policies and Any Legitimate Penological Interest. ........................ 6

    B.    The Jail's Policies Fail the Second Prong of *Turner* (Failure to
Provide Alternative Means for Exercising PLN's First Amendment
Rights). ........................................................................ 8

    C.    The Jail's Policies Also Fail the Third and Fourth Prongs of the
*Turner* Standard (Effect on Resources and Feasibility of Alternative
Policies). ........................................................................ 8

II.    DEFENDANTS ALSO VIOLATED PLN'S DUE PROCESS RIGHTS.................. 9

III.    THE COUNTY AND INDIVIDUAL DEFENDANTS ARE LIABLE FOR
THE CONSTITUTIONAL VIOLATIONS ................................................ 9

    A.    Defendants Babeu, Kimble, Johnson, Valenzuela, Montano, Romero,
McBirnie, and Hensley-Salisberry are Liable for Violations of PLN's
Rights........................................................................ 9

[638676-8]

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

B.      The County is Liable for its Policies and Lack Thereof ............................. 10

IV.    PERMANENT INJUNCTIVE RELIEF IS NECESSARY TO ASSURE
       THAT DEFENDANTS COMPLY WITH THEIR CONSTITUTIONAL
       OBLIGATIONS ........................................................................................... 13

       A.      Injunctive Relief is Necessary Because Defendants Admit They Have
               Been Unable to Control the Mailroom, and Because Unconstitutional
               Practices Continue ......................................................................... 13

       B.      The Balance of Equities Tips Towards Plaintiff and the Public Interest
               Would Benefit from the Issuance of an Injunction ....................................... 14

       C.      Defendants' Post-Litigation Change in Policy Does Not Moot the
               Claim for Injunctive Relief .................................................................. 15

V.     THE COURT SHOULD ALSO ISSUE A DECLARATORY JUDGMENT .......... 17

CONCLUSION .................................................................................................. 17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

[638676-8]

# TABLE OF AUTHORITIES

**Page**

## CASES

*4805 Convoy, Inc. v. City of San Diego,*
 183 F.3d 1108 (9th Cir. 1999) ................................................................. 14

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) .................................................................................. 1

*Ashker v. Cal. Dep't of Corr.,*
 350 F.3d 917 (9th Cir. 2003) ............................................................... 6, 7

*Berry v. Baca,*
 379 F.3d 764 (9th Cir. 2004) ................................................................. 12

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) .................................................................................. 1

*Chalmers v. Los Angeles,*
 762 F.2d 753 (9th Cir. 1985) ................................................................. 12

*City News and Novelty, Inc. v. City of Waukesha,*
 531 U.S. 278 (2001) ............................................................................... 16

*Clement v. Cal. Dep't of Corr.,*
 364 F.3d 1148 (9th Cir. 2004) ................................................................. 9

*Cline v. Fox,*
 319 F. Supp. 2d 685 (N.D. W.Va. 2004) ................................................. 7

*Crofton v. Roe,*
 170 F.3d 957 (9th Cir. 1999) ................................................................... 6

*Ctr. for Individual Freedom v. Carmouche,*
 449 F.3d 655 (5th Cir. 2006) ................................................................. 14

*Dunn v. Blumstein,*
 405 U.S. 330 (1972) ............................................................................... 14

*eBay Inc. v. MercExchange, L.L.C.,*
 547 U.S. 388 (2006) ............................................................................... 13

*Elrod v. Burns,*
 427 U.S. 347 (1976) ............................................................................... 13

[638676-8]

*Fed. Trade Comm'n v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ................................................................. 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................. 15

*Gibson v. County of Washoe*,
    290 F.3d 1175(9th Cir. 2002) ............................................................ 10, 12

*Gillette v. Delmore*,
    979 F.2d 1342 (9th Cir. 1992) ................................................................. 11

*Hrdlicka v. Reniff*,
    631 F.3d 1044 (9th Cir. 2011) .............................................................. 6, 8

*Jacklovich v. Simmons*,
    392 F.3d 420 (10th Cir. 2004) ................................................................... 6

*Joelner v. Village of Wash. Park*,
    378 F.3d 613 (7th Cir. 2004) ................................................................... 15

*Jones v. Caruso*,
    569 F.3d 258 (6th Cir. 2009) ................................................................... 13

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ................................................................. 15

*Krug v. Lutz*,
    329 F.3d 692 (9th Cir. 2003) ..................................................................... 9

*Long v. County of Los Angeles*,
    442 F.3d 1178 (9th Cir. 2006) ................................................................. 11

*Lytle v. Carl*,
    382 F.3d 978 (9th Cir. 2004) ................................................................... 10

*Mann v. Smith*,
    796 F.2d 79 (5th Cir. 1986) ....................................................................... 6

*Martyr v. Bachik*,
    770 F. Supp. 1406 (D. Or. 1991) ............................................................. 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................... 1

*Merritt v. County of Los Angeles*,
    875 F.2d 765 (9th Cir. 1989) ................................................................... 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ........................................... 10

*Montcalm Publ'g Corp. v. Beck*,
    80 F.3d 105 (4th Cir. 1996) ................................ 9

*Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*,
    160 Ariz. 350 (1989) ....................................... 5

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
    135 F.3d 1260 (9th Cir. 1998) ........................... 16

*Pembaur v. Cincinnati*,
    475 U.S. 469 (1986) ....................................... 10

*Prison Legal News v. Cook*,
    238 F.3d 1145 (9th Cir. 2001) ....................... 6, 9

*Prison Legal News v. Lehman*,
    397 F.3d 692 (9th Cir. 2005) ........................ 6, 9

*Prison Legal News v. Simmons*,
    401 F. Supp. 2d 1181 (D. Kan. 2005) ................. 6

*Sizemore v. Williford*,
    829 F.2d 608 (7th Cir. 1987) ........................... 6

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ........................ 13

*Thomas v. Leslie*,
    Nos. 97-3346, 97-3361, 1999 WL 281416 (10th Cir. Apr. 21, 1999)....................... 6

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989) ....................................... 6

*Turner v. Safley*,
    482 U.S. 78 (1987) ............................... 5, 6, 7, 8

*Verizon New Eng., Inc. v. IBEW*,
    651 F.3d 176 (1st Cir. 2011) .......................... 17

*Webb v. Sloan*,
    330 F.3d 1158 (9th Cir. 2003) ........................ 11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1

## **RULES**

2

Fed. R. Civ. P. 56(a) ........................................................................................ 1

3

Fed. R. Civ. P. 56(c)(1) .................................................................................... 1

4

LRCiv 56.1 ....................................................................................................... 2

5

6

## **STATUTES**

7

28 U.S.C. § 2201 ............................................................................................. 17

8

42 U.S.C. § 1983 ............................................................................................. 10

9

Ariz. Rev. Stat. § 11-441(A)(5) ..................................................................... 10

10

Ariz. Rev. Stat. § 31-101 ............................................................................... 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

# INTRODUCTION

Defendants who operate the Pinal County Jail have censored Plaintiff Prison Legal News's ("PLN's") publications and correspondence in violation of the First and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 6 of the Arizona Constitution.  Defendants refused to deliver PLN's correspondence and failed to provide Plaintiff with adequate notice that materials were censored or an opportunity to appeal that censorship.  There are no material issues of fact in dispute.  Defendants' liability is clear, and essentially admitted.  PLN moves for summary adjudication of Defendants' liability for violating PLN's constitutional rights, and for declaratory relief.  PLN also seeks a permanent injunction to insure that Defendants do not continue to violation PLN's rights.  Only damages issues, including punitive damages, should remain for trial to the jury.

# STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the nonmoving party may prevail only by "designat[ing] specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

# STATEMENT OF UNDISPUTED FACTS

PLN is a project of the Human Rights Defense Center, a non-profit organization that publishes an award-winning, 56-page monthly journal entitled *Prison Legal News*.

[638676-8]

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1  Declaration of Paul Wright in Support of Plaintiff's Motion, filed herewith ("Wright

2  Decl."), ¶¶ 2, 4.  The journal addresses legal issues such as access to the courts, discipli-

3  nary hearings, prison conditions, excessive force, and religious freedom.  *Id.* ¶ 4.

4    *Prison Legal News*, which has been continuously published since 1990, currently

5  has approximately 7,000 subscribers in the United States and abroad, including prisoners,

6  attorneys, journalists, public libraries, and judges.  *Id.* ¶ 7.  PLN is distributed to prisoners

7  in the Arizona Department of Corrections and a number of death row units and

8  "Supermax" prisons, including the federal ADX Supermax at Florence, Colorado, the most

9  secure prison in the world.  *Id.*  PLN also distributes approximately 45 legal and self-help

10 books on topics ranging from legal research to writing a business letter.  *Id.* ¶ 5.  In the 22-

11 year history, PLN has distributed over one million copies of its monthly publication but is

12 not aware of any security problems arising from its distribution.  *Id.* ¶¶ 7, 19.

13   Defendant James Kimble is Chief Deputy for Detention Services for the Pinal

14 County Sheriff's Office.  Statement of Undisputed Facts [hereinafter "SUF"], filed here-

15 with, ¶ 35.[1]  He issues Jail policies and oversees all Jail operations.  *Id.*  Defendant Paul

16 Babeu is the Sheriff of Pinal County and the final policy-maker for the Jail—although he

17 has delegated final authority to Mr. Kimble.  SUF ¶ 34.

18   **A.**  **Defendants' Censorship of Plaintiff's Publications and Correspondence**

19   Before this lawsuit was filed, PLN sent hundreds of items of correspondence and

20 publications to inmates at the Jail.   SUF ¶ 1.  These included three different types of

21 correspondence:  PLN's monthly journal of corrections news and analysis; a book called

22 "Protecting Your Health and Safety"; and PLN's Informational Brochure Pack, which

23 contained a *Prison Legal News* subscription order form and brochure, a book list, and an

24

25 [1] Pursuant to LRCiv 56.1, citations to evidence are to the Statement of Undisputed Facts
   (filed herewith) only where the fact is necessary to decide the motion for summary

26 judgment.  Other relevant facts, such as those providing background information and
   supporting the permanent injunction, are not included in the Statement of Undisputed

27 Facts, will be cited directly to the relevant evidence.

28

1   educational courses brochure.  SUF ¶¶ 2-4.  Jail staff took some of the publications and

2   correspondence sent by PLN, and without notice to the addressee or to PLN, simply threw

3   them in the trash.  SUF ¶ 6.  Other items were returned to PLN with notations on the items

4   that said "not allowed," "not approved," "refused," or "only 1 page letters allowed," or

5   were never returned.  SUF ¶ 5.  Defendants had no legitimate penological purpose for

6   refusing to deliver PLN's correspondence and publications to prisoners.  SUF ¶¶ 7, 8.

7                    **1.       Newspaper and Magazine Ban**

8            At least as far back as the Jail's April 5, 2005 mail policy, the Jail's official written

9   policy provided that newspapers and magazines were not allowed.  SUF ¶ 9.  The Jail

10  revised its official mail policy on January 31, 2010, July 18, 2010 and again April 24,

11  2011, but none of the revised policies specifically stated that newspapers and magazines

12  were allowed.  SUF ¶¶ 10-12.  The official mail policy documents are not provided to Jail

13  inmates.  SUF ¶ 15.  Instead, the Jail's policy and practice for informing inmates of the

14  rules they must follow is to provide them with a written Inmate Handbook when they

15  arrive at the Jail.  SUF ¶ 14.  As far back as February 2010 and through February 2012, the

16  Jail's Inmate Handbook provided that newspapers and magazines were "contraband."  SUF

17  ¶¶ 16-20.  The handbook was revised four times in 2010 and 2011, but the newspaper and

18  magazine ban was not changed.  *Id.*  The fact that newspapers and magazines were contra-

19  band meant that inmates could be disciplined if caught with them.  Declaration of Ernest

20  Galvan In Support of Plaintiff's Motion ("Galvan Decl."), filed herewith, Ex. I at 42:21-

21  44:12.  The Jail's web site also informed family and friends of inmates that newspapers

22  and magazines were not allowed.  SUF ¶ 21.

23          Mailroom staff and supervisors believed that newspapers and magazines were

24  prohibited.  SUF ¶ 22.  One supervisor testified that newspapers and magazines had been

25  banned since at least 1997, and another supervisor testified that it was common knowledge

26  that newspapers and magazines were banned, and that the only time he had seen prisoners

27  with newspapers with magazines was when they were confiscated.  Galvan Decl. Exhibit F

28  at 41:17-43:15; 54:14-22; Exhibit E at 35:17-36:22, 51:24- 52:22; 88:6-15.  The mail

policy revision in January 2010 did not specifically state that newspapers and magazines would be allowed, which resulted in the continuation of the long-established policy and practice of banning newspapers and magazines.  SUF ¶ 10.  No mailroom staff or supervisors received any training that policy had changed to allow newspapers and magazines, or in fact, any formal training about mail policies at all.  SUF ¶ 23.  Instead, when PLN publications arrived at the jail, mailroom staff testified that they either returned them to sender or threw them away. SUF ¶¶ 5, 6.

### 2.    Postcard and One-Page Letter Policy

Before 2010, Jail inmates could only communicate to and from the outside world through postcards.  Galvan Decl., Ex. K at 6; Ex. I at 60:2-62:7.  Defendants amended their written policy in 2010 to allow inmates and detainees to send and receive one-page letters in addition to postcards.  Galvan Decl., Ex. P at PCSO 35.  Immigration detainees held at the Jail, however, were allowed to receive all "regular mail."  *Id*.  The postcard/one-page letter policy prevented PLN from sending ordinary informational materials to Jail inmates.  SUF ¶ 5.  Materials sent by PLN, including its "information pack," were returned with a note on the front stating "only 1 page letters allowed."  *Id.*

### 3.    Approved Book Vendors

The Jail's written policy before this lawsuit was filed banned all hardcover books and allowed softcover books only when sent directly from "a recognized publisher, distributor or authorized retailer."  Galvan Decl. Ex. R, PCSO 66.  The Jail allowed softcover books to be ordered only from four approved vendors:  Amazon, Barnes & Noble, Borders, and Waldenbooks.  SUF ¶ 25.  PLN was not considered an approved publisher.  SUF ¶ 26.  As a result, books sent by PLN to inmates at the jail were not delivered to the inmates.  SUF ¶ 4.  One prisoner even complained that he was not able to order law books from Thomson/West.  Galvan Decl., Ex. W.

### B.    Lack of Notice to Plaintiff Or Its Subscribers

Until this lawsuit was filed, the Jail's policies contained no provision to notify senders when mail was not delivered.  SUF ¶ 27.  Nor was there any means or mechanism

4

1  by which any book vendor, publisher or distributor could appeal or apply in order to

2  become an "approved" publisher.  SUF ¶ 28.  Instead, as noted above, some materials were

3  thrown away, and some were "returned to sender," with a note like "not allowed" written

4  on the returned item.  SUF ¶¶ 5-6.  PLN was never provided any opportunity to appeal the

5  rejection of materials the Jail refused to deliver.  SUF ¶ 29.

     **C.**    **Defendants Changed Their Formal Policy But Continued Their Illegal Conduct After This Lawsuit Was Filed**

7        After Plaintiff's complaint was filed in September 2011, Defendants changed their

8  written policy on November 20, 2011.  Galvan Decl., Ex. S.  Under Defendants' new

9  policy, violations of the First Amendment continue.  Defendants continue to exclude books

10  from other non-profit organizations who distribute books to prisoners.  SUF ¶ 31.

11  Defendants also arbitrarily deny materials such as copies of pages from books and maga-

12  zines.  SUF ¶ 32.  Censorship of material printed from web sites blocks a key avenue

13  through which Plaintiff communicates with prisoners.  PLN publishes numerous materials

14  on its web site that family members and friends of prisoners can print out and send in.

15  SUF ¶ 33.  The outgoing mail policy also prohibits inmates from sending out mail that

16  weighs more than one ounce.  Galvan Decl., Ex. S, PCSO 78.

**ARGUMENT**

**I.**    **DEFENDANTS VIOLATED PLAINTIFF'S SPEECH RIGHTS UNDER THE FIRST AMENDMENT AND THE ARIZONA CONSTITUTION**

20        The Jail's policies and practices violate established law on the First Amendment

21  rights of publishers and prisoners.  "Prison walls do not form a barrier separating prison

22  inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84

23  (1987).  The Jail's policies and practices also violate Article 2, Section 6 of the Arizona

24  Constitution, which provides that "[e]very person may freely speak, write, and publish on

25  all subjects …."  That provision has been given even broader scope than the First

26  Amendment.  *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354

27  (1989).

28        Courts have long held that publishers and prisoners have First Amendment rights to

[638676-8]

communicate, subject only to limitations that are required by legitimate security concerns. *See Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011).  The First Amendment prohibits unreasonable restrictions on publishers' right to send materials to inmates.  *See Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (jail's "policy that forbade inmates to receive or possess newspapers and magazines" violated First Amendment); *Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (noting prisoners' "First Amendment right to receive and to read newspapers and periodicals"); *Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999) (striking down prison ban on gift publications); *Thomas v. Leslie*, Nos. 97-3346, 97-3361, 1999 WL 281416, at *7 (10th Cir. Apr. 21, 1999) (unpublished) (ban on newspapers violates the First Amendment).  Courts across the nation have upheld the right of PLN to send materials to incarcerated persons.  *See, e.g.*, *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001); *Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2005); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004), *sub nom. Prison Legal News v. Simmons*, 401 F. Supp. 2d 1181 (D. Kan. 2005).

When the First Amendment rights of a publisher are implicated, courts consider four factors set out in *Turner*, 482 U.S. at 89-91, to determine whether a constitutional violation exists.  *Hrdlicka*, 631 F.3d at 1048.  As described below, Defendants' policies and practices fail the *Turner* standard.

## A.  There Is No Valid, Rational Connection Between Defendants' Policies and Any Legitimate Penological Interest.

A policy violates the First Amendment unless the government can show "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."  *Turner*, 482 U.S. at 89; *accord Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).  If a correctional facility "fails to show that the regulation is rationally related to a legitimate penological objective, [courts] do not consider the other factors" of the *Turner* test and the rule is invalid.  *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003).  Defendants have no legitimate penological objective for their refusal to deliver materials sent by PLN.  SUF ¶ 8.  PLN's publications and correspondence, of

1  course, pose no threat to Jail safety and security.  SUF ¶ 7.  PLN has been sent out over a

2  million times in the past two decades, and no one has ever reported any security problems

3  as a result, even at the highest-security prisons in the country.  Wright Decl. ¶ 19.

4          The Jail's policies and practices are a radical departure from mainstream

5  correctional practice.[2]  Defendants' person-most-knowledgeable on mail policies had never

6  seen such restrictions until he arrived at the Jail, after seven years of service in the Arizona

7  Department of Corrections, including service as a Deputy Warden.  Galvan Decl., Ex. I at

8  10:23-11:10; 31:14-23.  Defendants' person-most-knowledgeable testified that there was

9  no legitimate penological interest for the postcard only policy, and that in his professional

10  experience there were penological benefits to allowing inmate correspondence.  *Id.* at

11  61:21-62:7.  *See also Cline v. Fox*, 319 F. Supp. 2d 685, 694 (N.D. W.Va. 2004) (access to

12  reading materials "lift the spirit, improve the mind, enrich the human personality, and

13  develop character") (internal quotation omitted).

14          With no legitimate penological interest claimed, the Jail's actions fail under the first

15  *Turner* factor and the inquiry ends.  *Ashker*, 350 F.3d at 922.  But even if Defendants had

16  pointed to a legitimate penological interest, they would fail to meet any of the other three

17  factors under *Turner*.  These are:  (2) "whether there are alternative means of exercising

18  the right" allowing "other avenues" for "the asserted right"; (3) "the impact

19  accommodation of the asserted constitutional right will have on guards and other inmates,

20  and on the allocation of prison resources generally," and (4) whether "the existence of

21  obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an

22  'exaggerated response' to prison concerns."  *Turner,* 482 U.S. at 90.

23

24  _____

25  [2] A federal district court recently enjoined a postcard policy similar to Pinal County's
    policy.  *Prison Legal News v. Columbia County,* 2012 U.S. Dist. LEXIS 74030, Case No.

26  3:12:-cv-00071 SI (May 29, 2012 D. Or.).  There, the court found that the jail's policy of
    limiting personal mail to postcards was not supported by any legitimate penological

27  interest.  *Id.* at *24-38.

28

[638676-8]

**B.    The Jail's Policies Fail the Second Prong of *Turner* (Failure to Provide Alternative Means for Exercising PLN's First Amendment Rights).**

Under the second *Turner* factor, the Court must consider whether the jail's policies allow "alternative avenues for the exercise of" the First Amendment right at issue – the right to correspond with prisoners and distribute books and publications.  *Hrdlicka*, 631 F.3d at 1053-54.  The Jail's policies fail the second prong because no reasonable alternative means exist for PLN to exercise its First Amendment rights to reach Jail inmates.

In some cases, a jail's policy may technically infringe upon a prisoner or publisher's rights, but still leave open alternative means for exercising those rights.  That is not the case here.  PLN had no alternative means to send its books or publications to inmates because newspapers and magazines were considered contraband and because PLN was not considered an "approved" vendor.  Neither could PLN send out its information pack because the Jail only allowed inmates to receive postcards or one-page letters.

**C.    The Jail's Policies Also Fail the Third and Fourth Prongs of the *Turner* Standard (Effect on Resources and Feasibility of Alternative Policies).**

The third and fourth prongs of *Turner* turn on whether accommodating the First Amendment right at issue will impose a significant burden on prison officials and whether ready alternatives to the challenged policies exist.  *See Turner,* 482 U.S. at 90.  Where a plaintiff points to an alternative than can accommodate free speech "at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 91.  "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  *Id.* at 90.

As Defendants have admitted, allowing the exercise of the First Amendments right at issue here will create no significant burden on Jail officials.  Galvan Decl., Ex. U at 5 (Supp. Response to Interrogatory No. 5).  Defendants would simply be required to deliver PLN publications and correspondence along with other mail.  This is what Defendants say that they now do, and what thousands of other correctional facilities do.  Any limited effect on staff workload does not justify restrictions on access to First Amendment rights.  *See*

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1  *Prison Legal News v. Lehman*, 397 F.3d at 700 (rejecting regulation designed to reduce

2  volume of mail); *Prison Legal News v. Cook*, 238 F.3d at 1151 (rejecting administrative

3  burden justification where lifting the ban would result only in "the addition of 15 to 30

4  pieces of mail" each day); *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1152 (9th Cir.

5  2004).  The Jail's draconian steps of banning all newspapers and magazines, limiting

6  books to four approved vendors, and restricting correspondence to a page trampled PLN's

7  First Amendment rights and are exactly the type of "exaggerated response" to any minimal

8  security concerns that is barred under *Turner*.

9  **II.    DEFENDANTS ALSO VIOLATED PLN'S DUE PROCESS RIGHTS**

10         The Due Process Clause requires that each time a correctional facility refuses to

11 deliver incoming material, it must provide both inmate and sender with notice and an

12 opportunity to challenge the censorship, with an appeal to a person other than the staff

13 member who made the censoring decision.  *See Procunier*, 416 U.S. at 417-19; *Cook*, 238

14 F.3d at 1152; *Krug v. Lutz*, 329 F.3d 692, 697-698 (9th Cir. 2003).  Consistent notice and

15 an opportunity to be heard is essential because it allows publishers to investigate and chal-

16 lenge violations of their constitutional rights, and to assist their subscribers with filing such

17 challenges.  *See Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 108-109 (4th Cir. 1996).

18         The Jail has not disputed that its policies provided no mechanism for the required

19 notice or opportunity to be heard each time correspondence or publications were rejected.

20 SUF ¶¶ 27-28.  As a result, on some occasions PLN materials were simply thrown away.

21 SUF ¶ 6.  On other occasions, PLN received items returned in the mail but was never pro-

22 vided an opportunity to challenge the denial.  SUF ¶¶ 5, 29.

23 **III.   THE COUNTY AND INDIVIDUAL DEFENDANTS ARE LIABLE FOR THE**
   **CONSTITUTIONAL VIOLATIONS**

24        **A.    Defendants Babeu, Kimble, Johnson, Valenzuela, Montano, Romero,**
              **McBirnie, and Hensley-Salisberry are Liable for Violations of PLN's**
25            **Rights**

26         As described above, a number of individual Defendants were responsible for the

27 violations of PLN's constitutional rights.  Sheriff Babeu is the final policymaker for the

28 Jail, and therefore liable for the violations caused by the Jail's policies.  SUF ¶ 34.  Deputy

9

[638676-8]

Chief Kimble issued the policies that resulted in the violation of PLN's constitutional rights to free speech and due process.  SUF ¶¶ 35-36.  Kimble, along with Commanders Johnson, Valenzuela, Montano and Defendant Linderholm, were responsible for drafting the unconstitutional policies and training staff.  SUF ¶ 36.  Detention Aides Romero, McBirnie and Hensley-Salisberry, the mailroom staff during the relevant period, violated PLN's constitutional rights by refusing to deliver these items to inmates without providing due process to PLN.  SUF ¶¶ 37-38.  These individuals each acted under color of state law in violating PLN's constitutional rights and are therefore liable under 42 U.S.C. § 1983.

### B.      The County is Liable for its Policies and Lack Thereof

Municipal liability is established where a municipality acts deliberately in violating an individual's rights or directed its employees to do so, or where, "through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees.…"  *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002).  "While 'authority to make municipal policy may be granted directly by a legislative enactment,' it may also be 'delegated by an official who possesses such authority.'"  *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)).  Arizona law gives the Sheriff the responsibility for operating county jails.  Ariz. Rev. Stat. § 11-441(A)(5); Ariz. Rev. Stat. § 31-101.  Sheriff Babeu has delegated the authority to make Jail policy to Deputy Chief Kimble.  SUF ¶ 34.

The Jail's refusal to deliver correspondence and publications from PLN and failure to provide due process were due to official Jail policy, long-standing practice or custom, or a failure to train Jail staff.  Chief Kimble issued a policy limiting correspondence to post-cards or one-page letters, which resulted in the refusal to deliver PLN's information packs.  SUF ¶¶ 5, 24.  Kimble's policy also provided no mechanism for notifying a sender when items were being returned, or for providing that sender an opportunity to appeal.  SUF ¶¶ 27-28.  The County is therefore liable for these official Jail policies.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (liability exists where violation caused by "those whose edicts or acts may fairly be said to represent official policy.").

The Jail's ban on newspapers and magazines, even after its inclusion in current written policy was made uncertain by vague drafting changes, was a long-standing practice or custom dating back to 1997 and incorporated in the Jail's 2005 formal written policy. SUF ¶¶ 9-22; Galvan Decl., Ex. F at 41:17-43:15; *cf. Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003) ("[I]f an employee commits a constitutional violation pursuant to a long-standing practice or custom, the employee's act is sufficient to support municipal liability."); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (liability exists where constitutional violations were pursuant to "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.").  This long-standing custom was reflected in the Inmate Handbook, the Jail's web site, and the understanding of jail staff.  SUF ¶¶ 16-22.  Similarly, the mailroom staff's practice of allowing books from only four approved vendors was also a long-standing practice or custom.  SUF ¶ 25.  These long-standing customs that stood in the place of official written policy make the County liable for these practices.

The County may attempt to run away from its actual policy and practice by pointing to policy documents issued after 2010 that, at best, created confusion and uncertainty by deleting the 2005 policy prohibition on newspapers and magazines, without expressly stating they were permitted.  Such contentions cannot create a triable issue of fact in this case, where, the policies on which the County will rely were not provided to the inmates (PLN's potential readers) while another document, the Inmate Handbook, was provided to inmates, and kept repeating over and over again through five separate versions in 2010 and 2011 that newspapers and magazines like PLN's publications were "contraband."  SUF ¶¶ 14-20.  The jail's public website, the source of information to inmates' families as to what sort of materials they could order for their loved ones, also stated that newspapers and magazines were banned during the relevant period.  SUF ¶ 21.

The County cannot avoid liability by claiming that its policies were so vague that mailroom staff "misunderstood" them in censoring PLN.  *See Long v. County of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006) ("[A] county's lack of affirmative policies or

11

1   procedures to guide employees can amount to deliberate indifference, even when the

2   county has other general policies in place."); *Berry v. Baca*, 379 F.3d 764, 768 (9th Cir.

3   2004) (even where county's policy was theoretically reasonable, the county could be liable

4   where "in practice, [its system was so deficient as to] amount[] to a policy of deliberate

5   indifference"). Such a rule "encourage[s] those in a policymaking position to institute

6   internal rules and programs designed to minimize the likelihood of unintentional

7   infringements on constitutional rights." *Chalmers v. Los Angeles*, 762 F.2d 753, 757-758

8   (9th Cir. 1985) (city liable for promulgating ordinances that were so unclear as to result in

9   predictable violations of Plaintiffs' rights). Here, the written policy banning newspapers

10  and magazines was clear from 2005 to early 2010, became at best unclear in one set of

11  documents (post-2010 formal policies) and was reiterated over and over in another set

12  (Inmate Handbooks) until early 2012. SUF 9-20. Jail staff could only conclude that the

13  ban remained in force until after this lawsuit was filed. SUF ¶ 22.

14         The County also cannot avoid liability by blaming mailroom staff because the Jail

15  failed to provide any training whatsoever regarding mail policies. *See Gibson*, 290 F.3d at

16  1194 (failure to train may serve as the basis for liability where it "amounts to deliberate

17  indifference to the rights" of the aggrieved party). Under Ninth Circuit law, to assess a

18  failure to train claim, the Court must assess "whether the existing training program [was]

19  adequate" and whether "the need for more or different training is so obvious" as to hold

20  the government entity liable. *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir.

21  1989). Here, where there was no training whatsoever, this is not a difficult question. SUF

22  ¶ 23. Jail management simply ignored the mailroom and hoped there would be no prob-

23  lems. Defendants' complete failure to provide any training to mailroom staff and supervi-

24  sors clearly constitutes deliberate indifference to PLN's constitutional rights and also sub-

25  jects the County to liability. Their indifference is further demonstrated by the fact that no

26  one has been disciplined for censoring PLN's mail. SUF ¶ 30.

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1  **IV.  PERMANENT INJUNCTIVE RELIEF IS NECESSARY TO ASSURE THAT DEFENDANTS COMPLY WITH THEIR CONSTITUTIONAL OBLIGATIONS**

2

3  The standard for injunctive relief is a four factor test.  "A plaintiff must

4  demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at

5  law, such as monetary damages, are inadequate to compensate for that injury; (3) that, con-

6  sidering the balance of hardships between the plaintiff and defendant, a remedy in equity is

7  warranted; and (4) that the public interest would not be disserved by a permanent

8  injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

9  **A.  Injunctive Relief is Necessary Because Defendants Admit They Have Been Unable to Control the Mailroom, and Because Unconstitutional Practices Continue**

10

11  PLN has suffered irreparable injury and remedies available at law are not adequate

12  to remedy its injury.  Defendants' policies have prevented PLN from carrying out its core

13  function – to communicate with incarcerated persons about developments in the law and

14  protection of their health and safety.  Wright Decl. ¶ 8.  As the Supreme Court has held,

15  "[t]he loss of First Amendment freedoms, for even minimal periods of time,

16  unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976);

17  *accord Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011) ("long line

18  of precedent" holds that violation of speech rights constitutes irreparable injury).  Courts

19  regularly grant injunctive relief based on the denial of speech rights in correctional set-

20  tings.  *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 277-78 (6th Cir. 2009) (affirming

21  preliminary injunction against prison mail policy); *Martyr v. Bachik*, 770 F. Supp. 1406,

22  1410-11 (D. Or. 1991) (granting preliminary injunction where correspondence restrictions

23  imposed on involuntarily committed individual "impose a great hardship upon him").

24  Defendants' own defense of this action shows the urgent need for injunctive relief.

25  Their defense boils down to this:  They cannot control their mailroom operation.  Their

26  person-most-knowledgeable on mail policy claims that his understanding of the policy

27  since 2010 was to allow newspapers and magazines in.  Galvan Decl. Ex. I at 33:1-21.

28  The staff and supervisors censored PLN's mail anyway, and testified that the actual policy

13

[638676-8]

and practice was to block all newspapers and magazines.  SUF ¶ 22.  When the people in charge found out about these practices, no one was disciplined.  SUF ¶ 30.

To this day, Defendants' practices are still at odds with the Constitution and with their stated policies.  The Jail continues to exclude books from non-profit organizations like Prison Legal News who distribute books to prisoners.  SUF ¶ 31.  Defendants also arbitrarily deny materials such as copies of pages from books and magazines, which prevents family members and friends from sending materials from PLN's web site.  SUF ¶¶ 32, 33; Galvan Decl., Ex. DD.  The mailroom also still arbitrarily denies various other materials sent by mail to inmates, including Postal Service Insured Mail Receipts, calendars, and pictures sent in as postcards.  Galvan Decl., Ex. EE.  The continued violations, particularly the exclusion of publications sent by other non-profit organizations, creates a reasonable expectation that PLN will face similar problems once this lawsuit is resolved.  In deciding whether there is a reasonable expectation of future action, "the Court does not always focus on whether a particular plaintiff is likely to incur the same injury." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006).  Instead, courts also evaluate whether other individuals will be affected similarly by the continuance of unconstitutional policies and practices.  *See id.*; *Dunn v. Blumstein*, 405 U.S. 330, 333, n.2 (1972); *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999) (under overbreadth doctrine, plaintiff "may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court.").  Without injunctive relief, PLN, inmates and other organizations will be subject to the whims of the Jail's erratic mail practices, and First Amendment violations will likely continue.

### B.  The Balance of Equities Tips Towards Plaintiff and the Public Interest Would Benefit from the Issuance of an Injunction

Given the irreparable harm suffered by PLN, the balance of equities tips toward PLN.  Defendants are clearly capable of accommodating PLN's First Amendment rights by delivering its correspondence and publications to prisoners.  Defendants cannot make

[638676-8]

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1   any credible argument that they would suffer any significant harm from the issuance of

2   injunctive relief.  Given the benefits of access to information from the outside world, an

3   injunction would likely improve both security and rehabilitation at the jails.  Galvan Decl.,

4   Ex. I at 62:1-7.

5          Furthermore, "[i]t is always in the public interest to protect First Amendment

6   liberties." *Joelner v. Village of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004).  Courts

7   have "consistently recognized the significant public interest in upholding free speech

8   principles." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (internal

9   quotation omitted).  Here, there is a clear public interest in enjoining Defendants'

10  infringements on the most basic free speech principles.

11         An injunction would protect not only publishers but also inmates.  Inmates regularly

12  write letters to PLN expressing interest in receiving *Prison Legal News*.  Wright Decl.

13  ¶ 17, Ex. E.  These letters speak to the hunger for expressive freedom that Justice Marshall

14  described in *Procunier*:  "When the prison gates slam behind an inmate, he does not lose

15  his human quality; his mind does not become closed to ideas; his intellect does not cease to

16  feed on a free and open interchange of opinions … It is the role of the First Amendment

17  and this Court to protect those precious personal rights by which we satisfy such basic

18  yearnings of the human spirit." 416 U.S. at 428 (Marshall, J., concurring).

19         **C.    Defendants' Post-Litigation Change in Policy Does Not Moot the Claim
            for Injunctive Relief**

20         Defendants revised their mail policy in November 2011 only because of this

21  litigation.  Galvan Decl., Ex I at 75:11-19.  Even if Defendants were conducting

22  themselves perfectly under the pressure of this lawsuit—which they are not, as described

23  above—an injunction would still be necessary and proper.  "[V]oluntary cessation of a

24  challenged practice" does not moot injunctive relief where Defendants are free to "return

25  to [their] old ways" and exclude PLN's publications and correspondence.  *Friends of the*

26  *Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Injunctive

27  relief is appropriate unless "subsequent events made it absolutely clear that the allegedly

28

1  wrongful behavior could not reasonably be expected to recur." *Id.*; s*ee also Fed. Trade*

2  *Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1238 (9th Cir. 1999) (standard is

3  "whether the defendant is free to return to its illegal action at any time."); *Norman-*

4  *Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998) ("heavy

5  burden" to show that wrongful behavior cannot be reasonably expected to recur).  This

6  doctrine protects against defendants who "seek to evade sanction by predictable

7  protestations of repentance and reform."  *City News and Novelty, Inc. v. City of Waukesha*,

8  531 U.S. 278, 284, n.1 (2001) (internal quotation marks omitted).

9      PLN needs an injunction to assure that its rights will not be violated after the threat

10  of litigation has passed.  Before this litigation, Defendants amended their mail policies at

11  least three times and amended their Inmate Handbook at least four times without changing

12  their unconstitutional policies.  SUF ¶¶ 10-12, 16-19.  Instead, management provided only

13  ambiguous policies and no training.  SUF ¶ 23.  Given that Defendants only allowed PLN

14  to communicate with inmates under the pressure of this lawsuit, an injunction is needed.

15  PLN's experience in litigating other censorship cases confirms that longstanding

16  censorship practices do not go away just because a written policy changes, and that

17  institutions are prong to backsliding into censorship without an enforceable court order.

18  Wright Decl. ¶ 20.  Defendants' post-lawsuit communications reflect a cavalier attitude

19  toward constitutional rights—with only the fear of litigation and attorneys' fees driving

20  them hastily to amend their formal policies.  *See* Galvan Ex. BB at PCSO 000545 ("just

21  another bump in the road"); Ex. GG at PCSO 001011 (Deputy Chief Kimble characterizing

22  effort to amend policies in response to this lawsuit as "this garbage").

23      In *Prison Legal News v. Fulton County, Georgia,* No. 07-CV-2618 CAP (N.D. Ga.),

24  county jail officials contended that injunctive relief was mooted by new policies.  Wright

25  Decl., Ex. F at 4.  The district court granted injunctive relief nonetheless under the well-

26  recognized doctrine that voluntary cessation does not moot injunctive relief.  *Id.*  The

27  duration of the unlawful policies in Fulton County (five years) necessitated injunctive

28  relief.  *Id.*  Here, the unlawful policies are even more long-standing—dating as far back as

[638676-8]

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

1   1997—and thus are even more likely to recur and persist than those in Fulton County.  *See*

2   Galvan Decl., Ex. F at 41:17-43:15 (newspaper and magazine ban enforced since 1997);

3   Ex O (2005 written policy).

4   **V.      THE COURT SHOULD ALSO ISSUE A DECLARATORY JUDGMENT**

5          PLN is entitled to declaratory relief stating the legal obligations of Defendants with

6   respect to PLN's constitutional rights.  The decision to grant declaratory relief is made

7   irrespective of injunctive relief.  *See* 28 U.S.C. § 2201 (Court "may declare the rights and

8   other legal relations of any interested party seeking such declaration, whether or not further

9   relief is or could be sought."); *Verizon New Eng., Inc. v. IBEW,* 651 F.3d 176, 189 (1st Cir.

10  2011) (Court must "decide the appropriateness and the merits of the declaratory request

11  irrespective of its conclusion as to the propriety of the issuance of the injunctions").

12         Here, declaratory relief is appropriate because the parties need clear guidance as to

13  what limitations the Jail may place on correspondence to and from inmates.  Defendants

14  have apparently begun allowing correspondence from PLN, but have denied publications

15  from similar organizations.  SUF ¶ 31.  This Court must clarify whether the Jail can ban

16  newspapers and magazines, whether it can restrict correspondence to one-page letters, and

17  whether it can pick and choose between book distributors.

18                                  **CONCLUSION**

19         The facts on which PLN relies are undisputed.  The law regarding prison mail bans

20  is clear.  PLN requests that the Court grant summary judgment as to Defendants' liability

21  for their censorship of PLN's correspondence and publications as a matter of law.  PLN

22  requests declaratory and injunctive relief as provided in the Proposed Order filed herewith.

23

24  DATED:  July 6, 2012                 Respectfully submitted,
                                         ROSEN BIEN GALVAN & GRUNFELD LLP
25

26                                       By:  */s/ Ernest Galvan*
                                              Ernest Galvan
27
                                         Attorneys for Plaintiff PRISON LEGAL NEWS
28