1    **WO**

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8    Prison Legal News, a project of the Human    No. CV-11-01761-PHX-GMS
     Rights Defense Center,
9                                                 **ORDER**
                                Plaintiff,
10

11   v.

12   Paul Babeu, individual and in his official
     capacity as Sheriff of Pinal County,
13   Arizona; et al.,

14                              Defendants.

15         Pending before the Court is Plaintiff Prison Legal News's ("PLN") Motion for

16   Partial Summary Judgment, Permanent Injunction, and Declaratory Judgment. (Doc. 85.)

17   Defendants have filed a Response and Cross-motion for Partial Summary Judgment.

18   (Doc. 102.) Each motion is granted in part, denied in part, and deferred in part. In

19   addition, PLN filed a Motion for Surreply (Doc. 134), which is denied.[1]

20                          **FACTUAL BACKGROUND**

21         Plaintiff PLN is a non-profit organization that provides a variety of materials to

22   prisoners throughout the country. (Doc. 89 ¶¶ 1-5.) It produces and distributes a 56-page

23   monthly journal that "provides information about legal issues such as access to courts,

24   disciplinary hearings, prison conditions, excessive force, mail censorship, prison and jail

25   litigation, visitation, telephones, religious freedom, prison rape, and the death penalty."

26   _____

27         [1] The Parties' requests for oral argument are denied because they have had an
     adequate opportunity to discuss the law and evidence and oral argument will not aid the
28   Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d
     724, 729 (9th Cir. 1991).

(*Id.* ¶ 4.) PLN also distributes a variety of books. (*Id.* ¶¶ 5-6.) These books include PLN's own publications as well as books published by other entities, such as "Protecting Your Health and Safety", which is published by the Southern Poverty Law Center. (*Id.*) According to PLN, it has around 7,000 subscribers and distributes its materials to around 2,200 correctional facilities. (*Id.* ¶ 7.) PLN challenges the actions of Pinal County Jail officers and employees, who failed to deliver PLN materials during 2011.

The Defendants to this action are all involved in the administration of the Pinal County Jail or work in its mailroom. Paul Babeu is the Sheriff of Pinal County and assumed that office on January 1, 2009. (Doc. 99 ¶ 53; Doc. 119 ¶ 53.) He delegated all responsibility for the Pinal County Jail and its policies to Deputy Chief James Kimble. (Doc. 87 ¶ 35; Doc. 99 ¶ 35.) Deputy Kimble's command staff included David Linderholm—the training specialist for jail staff since 2007 (Doc. 99-1, Ex. D (Linderholm Dep.) at 11:7-15; Doc. 99 ¶ 36), and Commanders Terry Johnson, Jaryme Valenzuela, and Ruben Montano, who reviewed policy and trained jail staff. (Doc. 87 ¶ 36; Doc. 99 ¶ 36.)

In the jail's mailroom, there were several detention aides who reported to a Sergeant who, from 2008 to January 2011, reported to a lieutenant. From some time in 2008 until July 2011 Tonya Delgado was the Sergeant who oversaw mailroom operations. (Doc. 88-1, Ex. A (Delgado Dep.) at 32:1-7.) She supervised Detention Aides Alyssa Romero, Laurenda Hensley-Salisberry, and Cheryl McBirnie, who sorted the mail. (*Id.*) Lieutenant Darrin Rushing was Sergeant Delgado's supervisor from 2008 to January 2011. (Doc. 88-1, Ex. F (Rushing Dep.) at 20:11-18.) He was succeeded by Lieutenant Gilbert Hoyos. (Doc. 88-1, Ex. F at 25:17-21.) In addition to reporting to Lieutenant Rushing, (Doc. 122, Ex. B (Delgado Dep.) at 76:18-77:6), Sergeant Delgado could also consult Commander Montano if questions arose about policy. (Doc. 99-1, Ex. E (Darrin Rushing Dep.) at 27:6-29:2.) Defendant Sergeant Leonard Arnold apparently took over supervision of the mailroom from Sergeant Delgado sometime in mid-2011.

1    There is no evidence that the remaining named Defendants[2] were involved in this case.

2         Beginning in February 2011, PLN attempted to send its publications to the jail's

3    inmates. (Doc. 87 ¶ 1-4; Doc. 99 ¶ 1-4.) These materials included the PLN monthly

4    journal; an Informational Brochure pack, which contained a subscription order form,

5    book list, and brochures; and the book "Protecting Your Health and Safety." (*Id.*; Doc. 89

6    ¶ 12.) Jail staff members were unfamiliar with PLN and had never seen its materials

7    before. (Doc. 99 ¶ 67; Doc. 119 ¶ 67.) It appears no magazines or newspapers had ever

8    been sent to the jail before. (Doc. 99 ¶¶ 76-77; Doc. 119 ¶¶ 76-77.) Starting in March

9    2011, PLN began receiving many of its materials back with various notations on them,

10   such as "not allowed", "only 1 page letters allowed", and "not sent from approved

11   publisher." (Doc. 89-1, Ex. C at PLNT 000042, 000045, 000172; Doc. 87 ¶ 5; Doc. 99 ¶

12   5.)

13        Detention Aides Romero, McBirney, and Hensley-Salisberry received the PLN

14   materials and were unsure how to handle them. (Doc. 88-1, Ex. H (Romero Dep.) at

15   25:12-21.) The detention aides took the matter to Sergeant Delgado, their supervisor, and

16   asked what they should do. (*Id.*) Sergeant Delgado asked the detention aides what they

17   did with similar publications and learned the aides had never seen analogous items

18   before. (Doc. 99-2, Ex. I (Delgado Dep.) at 76: 6-77:16.) Sergeant Delgado went to

19   Lieutenant Rushing who told Sergeant Delgado that he had never seen the pamphlets

20   before. (*Id.*) He gave no further direction. There is conflicting evidence about what

21   Sergeant Delgado did next. Detention Aides Romero and McBirney said that Sergeant

22   Delgado told them to return the materials to the sender or throw them away. (Doc. 88-1,

23   Ex. H (Romero Dep.) at 26:22-25, 27:1-2; *id.*, Ex. G (McBirnie Dep.) at 22: 10-13.)

24   Sergeant Delgado claims to have never told anyone to throw the materials away. (Doc.

25   99-2, Ex. I (Delgado Dep.) at 75: 3-5.) In either case, the detention aides proceeded to

26   _____

27        [2] Loretta Valdez, Dalton Gay, Eric Chavez, Dena Kelly, Amado Martinez, Frances
     Hawkings, and Lieutenants Matthew Hull, Dennis Rushing, Vernita Gant, and Michele
28   McNeely.

1  either discard the materials or send them back to PLN with the notations described above.

2  (Doc. 88, Ex. H (Romero Dep.) at 27:4-8; Doc. 99-1, Ex. C (Hensley-Salisberry Dep.) at

3  26:4-25.) PLN's materials did not, however, pose any safety or security threat. (Doc. 87 ¶

4  7; Doc. 99 ¶ 7.)

5      The official mailroom policy in effect[3] when PLN sent its materials did not

6  contain any specific provision governing newspapers and magazines. As one of the

7  rejection notices sent to PLN indicated, the policy limited incoming correspondence to

8  "post cards no larger than 5X7 or regular envelope with a single page letter." (Doc. 88-5,

9  Ex. Q at PCSO 000048; *id.* at PSCO 000062.) The policy also contained a "publisher-

10  only" rule. It provided that "[t]he mail room shall accept authorized publications directly

11  from the publisher (paperback). Hard back books are not authorized." (*Id.* at PCSO

12  000049; *id.* at PCSO 000063.) From its references to "paperback" and "Hard back," this

13  portion of the policy appeared to apply to books. Used books were also permitted,

14  provided they were "shipped directly from a recognized publisher, distributor, or

15  authorized retailer." (*Id.*) Later, the policy stated that "[p]ublications shall come directly

16  from a recognized publisher, distributor, or authorized retailer." (*Id.* at PCSO 000052, *id.*

17  at PCSO 000066.) Nowhere did the policy define the term "publication."[4] In addition, no

18  policy provision required jail officers to notify publishers that delivery had not taken

19  place and provide an opportunity to appeal the jail's refusal to deliver items. (Doc. 87 ¶¶

20  27-28; Doc. 99 ¶¶ 27-28.)

21      Despite the absence of a formal policy governing magazines and newspapers, the

22  practice in the mailroom was to ban them. Detention Aides McBirnie, Hensley-

23  Salisberry, and Romero all believed newspapers and magazines were banned. (Doc. 87 ¶

24  22; Doc. 99 ¶ 22.) Likewise, Sergeant Delgado and Lieutenant Rushing believed that

---

26  [3] Two separate policies applied during the period involved in the case, but the relevant provisions were identical. Both provisions are cited.

27  [4] Defendants argue that a stray reference to "a magazine or publication" that was present in a separate, unrelated clause demonstrates that magazine and publication were interchangeable. There is nothing in the policy to that effect.

- 4 -

newspapers and magazines were contraband and should be immediately rejected. (Doc. 88-1, Ex. A (Delgado Dep.) at 52:21-23; *id.*, Ex. F (Rushing Dep.) at 42:2-7.) In fact, the mailroom policy in effect until January 31, 2010—about a year before PLN began sending its materials—had included a blanket prohibition on magazines and newspapers.[5] The inmate handbook and jail website also stated that newspapers and magazines were considered contraband. (Doc. 88-1, Ex. J at PCSO 000112 (2/25/10 revision), Ex. K at PCSO 000126 (10/7/10 revision), Ex. L at PCSO 000140 (1/6/11 revision), Ex. M at PCSO 000154 (9/12/11 revision); Doc. 88-8, Ex. BB at PCSO 000545-48.)[6] In short, there was a widespread belief in the mailroom that newspapers and magazines were forbidden.

Mailroom staff also applied the publisher-only rule for books in a very limited fashion. Only four vendors were considered "recognized": Amazon, Borders, Barnes & Noble, and Waldenbooks. (Doc. 87 ¶ 25; Doc. 99 ¶ 25.) Only books coming from these publishers were allowed. (*Id.*) Finally, mailroom staff strictly enforced the rule limiting correspondence to postcards and one-page letters. (Doc. 87 ¶ 24; Doc. 99 ¶ 24.) PLN materials were denied under all three rationales: the newspaper/magazine ban, the publisher-only rule, and the one-page letter policy.[7] On April 27, 2011, an inmate filed a request for information about the materials he was expecting from Prison Legal News. (Doc. 89-1, Ex. D.) A member of the prison staff responded: "The only thing that was received for you from PLN was a letter but it was returned due to it having more than 1 page. PLN is not an approved publisher therefore you can't receive books from them or newspapers." (*Id.*)

---

[5] "The Mail Room will accept authorized publications directly from the publisher (excluding newspapers and magazines)." (Doc. 88-5, Ex. O at PCSO 00030.)

[6] The handbook was revised on February 14, 2012, to eliminate the language that newspapers and magazines were contraband.

[7] The notations included on the materials returned to PLN included statements like "not allowed," "only 1 page letters allowed," and "not sent from approved publisher." (Doc. 89-1, Ex. C at PLNT 000042, 000045, 000172; Doc. 87 ¶ 5; Doc. 99 ¶ 5.)

At the policymaker level, however, Pinal County asserts that there was a starkly different understanding of the mailroom policy. Deputy Kimble testified that mailroom policy permitted magazines and newspapers, since the language expressly banning newspapers had been removed. (Doc. 99-2, Ex. F, (Kimble Dep.) at 82:22-83:14.) After examining the policy, Specialist Linderholm also stated that magazines and newspapers were allowed. (Doc. 99-1, Ex. D, (Linderholm Dep.) at 56:19-59:4.)[8] Nevertheless, no member of the staff was disciplined for refusing to deliver PLN's publications. (Doc. 87 ¶ 30; Doc. 99 ¶ 30.) The command staff never conducted any training for mailroom staff on mailroom policies. (Doc. 87 ¶ 23; Doc. 99 ¶ 23.)

PLN filed the instant lawsuit on September 7, 2011. (Doc. 1.) By that time, PLN had attempted to send around 420 items to inmates at Pinal County Jail. (Doc. 89 ¶ 12; Doc. 87 ¶ 1-4; Doc. 99 ¶ 1-4.)

On November 20, 2011, Pinal County Jail issued an updated mail policy. Under the new policy, inmates were provided "with access to books and periodicals [unless the materials] jeopardiz[ed] safety, security, order and other legitimate PCSO-ADC interests." (Doc. 88-6, Ex. S at PCSO 000082.) Books sent from a "publisher, a book club, or other approved commercial supplie[r]" were permitted. (*Id.* at PCSO 000075.) As before, used books were authorized so long as they were "shipped directly from a recognized publisher, distributor or authorized retailer." (*Id.* at PCSO 000083.) Publications likewise had to come "directly from a recognized publisher, distributer, or authorized retailer." (*Id.* at PCSO 000082.) The policy did not provide a description of how a publisher or distributor becomes "recognized" or a commercial supplier or retailer "authorized." Nevertheless, the new policy required mailroom staff to give notice to both the prisoner and the sender of a rejection of materials (Doc. 88-6, Ex. S at PCSO 000080), and provided an opportunity to appeal (Doc. 99-1, Ex. F (Kimble Dep.) at

---

[8] In addition, an email sent from Commander Montano to Specialist Linderholm after this lawsuit was filed asked Specialist Linderholm whether newspapers and magazines were allowed. Specialist Linderholm answered, "yes." (Doc. 99-2, Ex. J.)

71:22-72:2). Specialist Linderholm conducted several training sessions on the new policy with mailroom staff. (Doc. 99 ¶ 88; Doc. 119 ¶ 88.)

PLN materials have not been rejected for non-compliance with the policy since the revision issued in November 2011. (Doc. 99 ¶ 94; Doc. 119 ¶ 94.) Other materials from non-profits have. The jail has rejected one book from Bookman's (Doc. 88-8, Ex. CC at PCSO 005292), four books from Read Between the Bars (*Id.* at PCSO 005241-44, 005424), and two National Geographic Magazines from Prison Library Project (*Id.* at PCSO 005424).[9]

On July 6, 2012, PLN filed for summary judgment, declaratory judgment, and a permanent injunction. (Doc. 85.) It asks this Court to grant summary judgment for it on the issue of all Defendants' liability for refusing to deliver PLN materials. PLN also seeks a permanent injunction that enjoins the jail and its officers against denying future PLN materials. Finally, PLN requests this Court to declare what limitations the jail may place on correspondence between publishers like itself and inmates, specifically whether the jail can ban newspapers and magazines, restrict correspondence to one-page letters, and whether the jail can apply a publisher-only rule. The Defendants opposed and cross-moved for summary judgment on the issue of liability and damages. (Docs. 101, 102.)

**DISCUSSION**

## I.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly

---

[9] In addition, one prisoner filed a grievance with the jail and asked about a book he was expecting from Read Between the Bars. (Doc. 88-8, Ex. AA at PSCO 000224). The response indicated that Read Between the Bars was not a recognized publisher, and cited Amazon, Borders, and Barnes and Noble as examples, despite the fact that these entities seem not to be publishers at all but perhaps constitute "recognized distributors," "authorized retailers" or "commercial suppliers." (*Id.*)

preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson,* 477 U.S. at 250).

## II.   ANALYSIS

PLN claims Defendants violated its rights under the Fourteenth Amendment to the U.S. Constitution. It seeks both injunctive relief and damages. The basis for the claim is Section 1983 of Title 42 of the U.S. Code, which provides a cause of action for persons who have been deprived their constitutional rights by persons acting under color of law.[10] Section 1983 "is not itself a source of substantive rights" but provides a cause of action "for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). PLN seeks damages for the enforcement of jail policies during 2011 that it claims were unconstitutional. It also seeks a permanent injunction against any further refusal by the Defendants to deliver PLN materials pursuant to the current publisher-only rule, which it claims remains unconstitutionally vague. Each of the policies is reviewed below.

---

[10] The statute reads, in full: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." 42 U.S.C. § 1983 (2006).

1

### A.    Constitutional Violations

PLN contends that its First Amendment rights were violated when Pinal County Jail refused to deliver its materials to the inmates pursuant to a belief that newspapers and magazines were banned, new publications or used books could only come from four specific retailers, and correspondence was limited to a single page.[11] PLN likewise claims that its due process rights under the Fourteenth Amendment were violated when the jail did not give notice of its rejection of the materials and failed to provide an opportunity to appeal.

As a general matter, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Yet a prison is a unique location that has unique needs. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id.* at 84-85. In light of the constitutional principles of separation of powers and federalism, the actions and policies of prison administrators receive a level of deference. *See id.* Accordingly, when prison regulations are challenged federal courts engage in the four-factor inquiry laid out in *Turner*:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (citing *Turner*, 482 U.S. at 89-90). Examination of each of the prison's challenged policies is required.

---

[11] The free speech clause of the First Amendment operates against the states and municipalities by virtue of the Fourteenth Amendment's Due Process Clause. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

### 1.       First Amendment Claims

The First Amendment to the Constitution has direct application to the correspondence that PLN seeks to have with the inmates at the Pinal County Jail. "Publishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). This right applies to unsolicited literature, like that sent by PLN. *See Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011) ("A First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information. . . . We see no reason why this well-established principle does not apply to a publisher's interest in distributing, and an inmate's corresponding interest in receiving, unsolicited literature."), *cert. denied*, 132 S. Ct. 1544 (2012). PLN challenges several past and present aspects of the Pinal County Jail's mailroom policies as violative of its First Amendment rights.

### a.       Blanket Newspaper and Magazine Ban

Jail staff rejected PLN materials under the assumption that prison policy banned all newspapers and magazines. (Doc. 89-1, Ex. C at PLNT 000042, 000045, 000172.) While the parties debate whether or not the mailroom policy actually banned books and newspapers, Defendants admit that such materials were effectively banned in 2011 and that enforcing a blanket ban on magazines and newspapers violates the First Amendment. (Doc. 98 at 7.) Accordingly, there is no dispute that the practice of the Jail in this respect during 2011 was unconstitutional.

### b.       Publisher Requirements

Jail staff also turned away PLN materials under the policy provision that permitted delivery of publications only if they came from "a recognized publisher, distributor, or authorized retailer." (Doc. 88-5, Ex. Q at PCSO 000052, *Id.* at PCSO 000066.)[12] During the relevant portions of 2011, the policy was interpreted to allow books and publications

---

[12] Jail staff sometimes used the word "approved" to describe the policy requirements. (Doc. 89-1, Ex. C at PLNT 000042, 000045, 000172.)

1   that came from only four publishers: Amazon, Borders, Barnes & Noble, and

2   Waldenbooks. (Doc. 87 ¶ 25; Doc. 99 ¶ 25.) Defendants admit that this narrow

3   construction of the publisher-only requirement violated PLN's First Amendment rights.

4   (Doc. 98 at 7.) Such an arbitrary limitation is unconstitutional.

5       The current policy—like its predecessor—retains substantially the same language

6   as the 2011 iteration and allows publications from only "the publisher, a book club, or

7   other approved commercial supplie[r]." (Doc. 88-6, Ex. S at PCSO 000075.)[13] Since this

8   lawsuit was filed, however, all PLN materials have been permitted. (Doc. 99 ¶ 94; Doc.

9   119 ¶ 94.) PLN nevertheless attacks the current version of the publisher-only rule as

10  "vague and contradictory" because there is no direction given on how jail staff are to

11  determine whether a publisher is "recognized." (Doc. 117 at 18.) Defendants argue any

12  PLN attack on the publisher-only rule is now moot because the current policy, as

13  enforced, inflicts no harm on PLN, whose books and publications are allowed into the

14  jail. Books that have been rejected under the new policy have come from unrelated

15  organizations, such as Prison Library Project and Read Between the Bars, whose status as

16  publishers is a matter of dispute and who are not parties here. (Doc. 88-8, Ex. AA at

17  PCSO 000224-26; *id.*, Ex. CC at PCSO 005292, 005241-44, 005424.)

18      "It is well settled that a defendant's voluntary cessation of a challenged practice

19  does not deprive a federal court of its power to determine the legality of the practice. [I]f

20  it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old

21  ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189

22  (2000) (internal quotations and citations omitted). The standard for mootness is strict: "A

23  case might become moot if subsequent events made it absolutely clear that the allegedly

24  wrongful behavior could not reasonably be expected to recur. The heavy burden of

25  persua[ding] the court that the challenged conduct cannot reasonably be expected to start

26  up again lies with the party asserting mootness." *Id.* The Defendants offer only their

27
28      [13] Similarly, used books can come from a "recognized publisher, distributor or
    authorized retailer." (*Id.* at PCSO 000083.)

assurances that PLN materials will be accepted under the publisher-only rule. That rule has not been effectively altered since the outset of this lawsuit. And there is evidence that other non-profits have not been able to have their materials delivered. Consequently, PLN's vagueness challenge to the publisher-only rule is not moot.

PLN does not challenge the publisher-only requirement under *Turner*; instead, it asserts that the policy is unconstitutionally vague because it fails to provide any guidance to outside parties on how to become an approved publisher or distributor.

> There are three objections to vague policies in the First Amendment context. First, they trap the innocent by not providing fair warning. Second, they impermissibly delegate basic policy matters to low level officials for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, a vague policy discourages the exercise of first amendment freedoms.

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). "[W]here the guarantees of the First Amendment are at stake the [Supreme] Court applies its vagueness analysis strictly." *Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988).

The Parties clearly agree that all PLN materials are currently allowed under the policy. PLN sends in (1) its own newsletter, (2) its own brochures and pamphlets, (3) books that it has published, and (4) books that are published by other entities. (Doc. 89 ¶¶ 4-6, 12.) For PLN's own newsletter, brochures, and pamphlets and self-published books, the Defendants have presumably determined that PLN is a "recognized publisher", a "recognized distributor", a "recognized retailer", a "book club", an "other approved commercial supplier", or some or all of the above. For books that PLN sends in that are not published by PLN, the jail apparently considers PLN a "book club" or an "other approved commercial supplier".

PLN asks the Court to enter a permanent injunction that it may send materials into the jail and have them received by the addressees. Nevertheless, in light of the deference to which prison officials are entitled, the Court is disinclined to enter such a broad and

1   undefined injunction on a permanent basis, when it is not sure on what basis the jail has

2   determined to presently accept all the materials that PLN sends into it. PLN might change

3   the nature of materials it seeks to send into the jail that could conceivably cause security

4   or management concerns. Nor, in light of the jail's undisputed representation that all of

5   PLN's materials are now being received, is it necessarily clear that such an injunction is

6   necessary.

7         On the other hand, when Defendants have not explained what determinations were

8   made under the current policies to allow the receipt of PLN's materials, nor the criteria

9   on which such determinations were made, if any, it is possible that the jail's current

10   decision to allow such materials may be ephemeral. This is underlined by the jail's

11   refusal to permit mailing privileges to other organizations that PLN asserts are similar to

12   it. Further, to the extent there are no such criteria there is the possibility if not likelihood

13   that the jail is resolving such matters "on an ad hoc and subjective basis, with the

14   attendant dangers of arbitrary and discriminatory application." *Cohen*, 92 F.3d at 972.

15         The Court therefore orders Defendants to supplement the record within 14 days of

16   this Order to inform the Court on what policy basis it is currently allowing each category

17   of PLN material and how such evaluations were made including any criteria promulgated

18   to jail personnel by which such evaluations were made. PLN will be given 14 days in

19   which to make a response. The Court will then resolve the outstanding issues with regard

20   to the publisher-only rule and the necessity for a permanent injunction in favor of PLN.

21           **c.**      **One-Page/Postcard Limitation**

22         The jail also rejected PLN materials pursuant to its policy limiting correspondence

23   to one-page letters or postcards. (Doc. 88-5, Ex. Q at PCSO 000048; *Id.* at PSCO

24   000062.) PLN contends that the only justification for the correspondence policy was

25   reduction in the volume of mail that must be screened for contraband, and that such a

26   justification is insufficient under *Turner*. Defendants largely agree that volume reduction

27   is the justification, but assert that such a justification is appropriate under *Turner*.

28         The first *Turner* prong asks "whether the regulation is rationally related to a

legitimate and neutral governmental objective." *Cook*, 238 F.3d at 1149. "Restrictive regulations are permissible if they are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality op. of Breyer, J.) (reasoning that policy banning newspapers and magazines for the "worst of the worst" inmates could be justified by providing incentive for prisoners to improve behavior, after which they could receive newspapers and magazines). Courts "afford considerable deference to the expertise and decision making of prison administrators." *Cook*, 238 F.3d at 1140 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989)).

Decisions of this Court have upheld a postcard-only policy against a First Amendment challenge, finding that "the reduction of contraband smuggling is a legitimate goal of . . . jails and that the [postcard-only] policy is reasonably related to furthering that goal. The policy is also neutral on its face—there is nothing to indicate that the aim of the policy is to suppress expression." *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1153 (D. Ariz. 2009); *see also Gieck v. Arpaio*, No. CV 07-1143-PHX-NVW 2008 WL 2604919 at *5 (D. Ariz. June 23, 2008). Another court of this circuit has suggested that jail officials concerned with controlling the volume of material that must been screened for contraband "could limit the number of pages an inmate may receive in each piece of correspondence." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1110 (N.D. Cal. 2002), *aff'd*, 364 F.3d 1148 (9th Cir. 2004).

There appears to be a common-sense connection between a jail goal of reducing contraband and limiting the number of pages a particular piece of correspondence contains. PLN cites *Prison Legal News v. Lehman* to justify its claim that volume reduction is not a legitimate and neutral governmental objective, but *Lehman* concerned a ban on non-subscription bulk rate mail that the court determined was "an arbitrary means of achieving the goal of volume control." 397 F.3d at 700. It was not the "goal of volume control" that was the problem—it was the means chosen by the prison in *Lehman*. In contrast to a policy that prohibits certain types of mail and allows others depending on its

postage rate, a one-page policy for correspondence applies across the board and delivers less arbitrary results. Lines of communication are open for all who wish to send letters to prisoners. Moreover, PLN has not provided any evidence that would refute the obvious connection between a page limit and volume control. The remaining *Turner* factors do not counsel against the constitutionality of the jail's policy. Sufficient alternative avenues of communication remain open for publishers like PLN who wish to communicate with inmates at the Pinal County Jail: newspapers, magazines, books, brochures and other publications. The jail's policy limiting correspondence to one-page and postcards did not violate the First Amendment.[14]

### 2.   Due Process

PLN asserts that the Defendants violated its procedural due process rights under the Fourteenth Amendment when it was not given notice and an opportunity to appeal the jail's refusal to deliver materials. Defendants admit that the policy's failure to so provide was a Fourteenth Amendment violation.

Accordingly, the Defendants' following policies were unconstitutional: (1) banning newspapers or magazines, (2) allowing publications only from the four specific retailers, and (3) failing to provide notice of rejection and an opportunity to appeal. Disposition of PLN's challenge to the current publisher-only rule awaits Defendants' supplemental filing.

### B.   Injunctive and Declaratory Relief

PLN seeks a permanent injunction against Defendants refusing to deliver PLN materials. Because the Jail's current policy expressly allows newspapers, magazines, books, and other publications, PLN's only basis for injunctive relief is the alleged opacity of the current publisher-only rule. PLN claims the publisher-only rule is impermissibly

---

[14] PLN appears to also challenge the constitutionality of the publication insert policy in its Reply. (Doc. 117 at 28.) The Court need not consider this argument because it was raised for the first time in PLN's Reply. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed waived.").

vague and that PLN therefore runs the risk of having its materials rejected again by the Jail. As the Court indicated above, it is not clear under what rationale Defendants are currently allowing PLN materials. Clarification of this point is necessary for the Court to determine whether permanent injunctive relief is warranted. The Court therefore defers ruling on PLN's Motion for a Permanent Injunction until Defendants supplement the record in accordance with the Court's Order.

In its motion for summary judgment, PLN also requests declaratory relief, namely that this Court to "clarify whether the Jail can ban newspapers and magazines, whether it can restrict correspondence to one-page letters, and whether it can pick and choose between book distributors." (Doc. 86 at 25.) The Court has addressed these questions *supra* and declines to grant additional declaratory relief that is unsupported by the record.

## C.   Section 1983 Liability

In addition to prospective injunctive relief, PLN seeks damages for past constitutional violations. PLN's free speech rights were violated when the jail refused to allow delivery of PLN materials because it believed newspapers and magazines were banned and that PLN was not a recognized publisher, distributor, or retailer, as it interpreted those terms at the time. In addition, PLN's rights to due process were violated when it was not provided with notice and an opportunity to appeal the refusal.

While they have conceded the unconstitutionality of these policies, Defendants claim first that many named Defendants were not involved in the constitutional deprivations. For § 1983 liability to attach, each Defendant must be personally involved in the constitutional deprivation. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983.").

For those who were involved, Defendants raise the defense of qualified immunity in response to PLN's damage claim. *See Wilson v. Layne*, 526 U.S. 603 (1999). Qualified immunity protects government officials "from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Whether a reasonable officer should have known of a right in a particular factual context depends solely and objectively on whether a principle of law had been 'clearly established at the time' the officers took the contested action." *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1000 (D. Ariz. 2012) (internal quotation marks omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks omitted); *Wilson v. Layne*, 526 U.S. 603, 614 (1999) ("What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks omitted); *Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1222 (9th Cir. 2012) (describing the clearly established prong and reasonableness inquiries as the same), amended in nonrelevant part, ___ F.3d ___, 2013 WL 674059 (9th Cir. Feb. 26, 2013).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S.Ct. 2074, 2083 (2011) (internal quotations omitted). To determine whether a properly defined right has been clearly established, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Anderson*, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). "If a principle of law had been 'clearly established' by the Supreme Court, the Ninth Circuit, or a consensus of

1    persuasive authority at the time of the incident, it has been clearly established." *Hulstedt*,

2    884 F. Supp. 2d at 1001 (citing *al-Kidd*, 131 S. Ct. at 2084).

3          "Whether the law was clearly established is an objective standard; the defendant's

4    'subjective understanding of the constitutionality of his or her conduct is irrelevant.'"

5    *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012). The liability of

6    Defendants for the First Amendment and Due Process violations is considered in turn.

7                              **1.      First Amendment**

8          A blanket ban on newspapers and magazines violated clearly established

9    constitutional law at the time jail staff either threw away or sent back PLN's materials.

10   While there case has directly held that a blanket ban on newspapers and magazines

11   violates the First Amendment, the Ninth Circuit stated twenty years ago that a blanket

12   ban on magazines "carries a heavy presumption of unconstitutionality." *Pepperling v.*

13   *Crist*, 678 F.2d 787, 791 (9th Cir. 1982). The Supreme Court has appeared wary of

14   blanket bans. *See Thornburgh*, 490 U.S. at 416 (taking comfort in the fact that prison

15   officials made individual determinations of the admissibility of magazines). Other

16   circuits have surveyed the law across the country and determined that the

17   unconstitutionality of a blanket ban on magazines and newspapers was clearly

18   established. *See Thomas v. Leslie*, 176 F.3d 489 (10th Cir. 1999) (collecting cases,

19   determining that right to receive and read newspapers was clearly established); *Kincaid v.*

20   *Rusk*, 670 F.2d 737, 744 (7th Cir. 1982) (wholesale prohibition cannot be justified by

21   need for maintaining security and discipline). The Ninth Circuit has consistently held that

22   prisoners have a right to receive and publishers the right to send materials in prisons. *See*

23   *Lehman*, 397 F.3d at 699; *Hrdlicka*, 631 F.3d at 1049 (describing as "well-established"

24   the "First Amendment interest in distributing and receiving information does not depend

25   on a recipient's prior request for that information"), *cert. denied*, 132 S. Ct. 1544 (2012).

26   A blanket ban on newspapers and magazines violates these well-established principles.

27         Because the blanket ban violated clearly established constitutional law of which a

28   reasonable officer should know, no qualified immunity attaches to the conduct at issue.

Consequently, those Defendants who were actually involved in the First Amendment violation are liable.[15]

### a.      Mailroom Staff

Detention Aides Romero, Hansley-Salisberry, and McBirnie were individually involved in the deprivation of PLN's First Amendment rights—they either returned or threw away the materials sent by PLN. They also cannot claim qualified immunity. In taking into account certain subjective factors, e.g., the inadequacy of training that the detention aides received, the fact that they had never received materials from PLN before, and the fact that they asked their supervisors for guidance, it may appear that they did everything they should have in the given situation.

Nevertheless, the qualified immunity inquiry is principally an objective one that depends upon how clearly the legal principles were established that were violated by the actors. *Pearson*, 555 U.S. at 244; *Wilson*, 526 U.S. at 614; *Moss*, 675 F.3d at 1222; *Hulsdet*, 884 F. Supp. 2d at 1000. It is true that the qualified immunity analysis is sometimes described as having two prongs: (1) whether the law governing the state official's conduct was clearly established, and then (2) whether a reasonable state official could have believed his conduct was lawful in light of the clearly established law. *See Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001). That second step involves an analysis of the given factual situation. The cases where the two-step inquiry come into play, however, involve situations where state officials are making judgment calls that are cabined by constitutional norms, e.g., whether probable cause or exigent circumstances exist in a given situation, see *Anderson*, 483 U.S. at 640-42; *Hunter v. Bryant*, 502 U.S. 224, 227-29 (1991), or whether a police officer used excessive force, see *Hope v. Pelzer*, 543 U.S. 194 (2004). To determine whether officials violated constitutional rights in

---

[15]   The Court has agreed with the Parties' stipulation regarding the unconstitutionality of the Jail's application of the publisher-only rule to limit incoming books to those coming from four specific publishers. Yet because the primary basis for rejecting PLN materials according to the record was a believed ban on newspapers and magazines, the Court evaluates only that practice under the "clearly established" standard.

1  those situations absolutely requires detailed analysis of the factual scenario.

2  Here the law was clear at the time relevant to this suit—blanket bans on

3  newspapers and magazines in prisons violate the First Amendment. Accordingly, "[t]he

4  contours of the right [were] sufficiently clear that every reasonable official would have

5  understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S.Ct. at 2083.

6  The Constitution does not afford a range of discretion to detention aides on this matter.

7  The act of refusing all newspapers and magazines was the violation. It was objectively

8  unreasonable for a detention aide to throw away mail, or refuse to deliver it, based upon a

9  perceived blanket ban on magazines. The detention aides were the primary drivers of the

10  constitutional injuries that PLN suffered. The fact that Sergeant Delgado and Lieutenant

11  Rushing may have told the detention aides to refuse PLN materials cannot be decisive on

12  the existence or absence of qualified immunity. Defendants have not directed the Court to

13  any cases (nor as the Court found any) where qualified immunity attached to otherwise

14  clearly unconstitutional conduct based on a "just following orders" rationale. Likewise,

15  the detention aides cannot claim to have been following official policy because the

16  mailroom's official policy did not provide for a ban on newspapers and magazines, and

17  there is no evidence that the detention aides were acting pursuant to instructions from

18  official policymakers. Likewise, there is no evidence that they consulted the official

19  policy (which did not expressly ban newspapers or magazines). The detention aides

20  therefore cannot receive qualified immunity and are liable under § 1983 for the First

21  Amendment deprivations.

22  Moving up the ladder, Sergeant Delgado's actions as supervisor of the mailroom,

23  and Lieutenant Rushing's actions as her supervisor also establish their personal

24  involvement in the First Amendment violations. Upon receipt of the PLN materials,

25  Sergeant Delgado's subordinates came to her and asked her what they were supposed to

26  do with the materials. (Doc. 88, Ex. H (Romero Dep.) at 26:22-25, 27:1-2; *Id.*, Ex. G

27  (McBirnie Dep.) at 22: 10-13; Doc. 99-1, Ex. C (Hensley-Salisberry Dep.) at 26:4-25.)

28  The general understanding was that newspapers and magazines were not allowed. (Doc.

88-1, Ex. A (Delgado Dep.) at 52:21-23.) Sergeant Delgado went to Lieutenant Rushing, the previous supervisor of the mailroom and her direct supervisor, and he told her that he had no idea what to do. (Doc. 99-2, Ex. I (Delgado Dep.) at 76: 6-77:16.) It does not appear that either Lieutenant Rushing or Sergeant Delgado consulted the mailroom policy or even asked to look at the materials. Nor does it appear that they went to Cmdr. Montano or any of the command staff to determine how to handle this information. (Doc. 99-1, Ex. E (Darrin Rushing Dep.) at 27:6-29:2.) Instead, after failing to get guidance from Lieutenant Rushing, Sergeant Delgado either gave no direction (Doc. 120, Ex. B (Delgado Dep.) at 58:5-25) or told her staff to send the materials back (Doc. 88-1, Ex. G (McBirnie Dep.) at 22: 10-13). In fact, she admitted that it would be unacceptable to allow the detention aides to unilaterally make decisions without any guidance. (Doc. 99-2, Ex. I (Delgado Dep.) at 137:9-21.) Both Sergeant Delgado and Lieutenant Rushing failed to act in the face of clear evidence of a constitutional violation were therefore personally involved in the constitutional deprivation.

Qualified immunity does not attach to their conduct because the rights they violated were clearly established at the time. Sergeant Delgado and Lieutenant Rushing make arguments for the application of qualified immunity along the lines of those made by detention aides. The Court rejects those arguments pursuant to the reasoning above. Sergeant Delgado and Lieutenant Rushing are liable under § 1983 to PLN.

### c.    Command Staff

Specialist Linderholm and Commanders Johnson, Valenzuela, and Montano reviewed jail policy and had responsibility for training. (Doc. 99-1, Ex. D (Linderholm Dep.) at 11:7-15; Doc. 99 ¶ 36; Doc. 87 ¶ 36.) When PLN sent materials, the policy in effect did not expressly ban newspapers and magazines, although that was how ground-level staff administered it. After reading the policy at his deposition, Specialist Linderholm stated that newspapers and magazines were allowed. (Doc. 99-1, Ex. D, (Linderholm Dep.) at 56:19-59:4.) And in a post-lawsuit email, Specialist Linderholm told Cmdr. Montano that magazines were allowed. (Doc. 99-2, Ex. J.)

PLN has failed to produce sufficient evidence of personal involvement to raise an issue of fact as to the command staff's § 1983 liability. The only evidence it has cited suggests that the command staff has some input into policymaking and training. PLN has therefore failed to demonstrate a genuine dispute of material fact as to the command staff's involvement in the First Amendment violations. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") For liability to attach under § 1983, the courts require specific facts showing a definite connection between the actions of the official and the injury suffered by the plaintiff. *See Jones*, 297 F.3d at 934. PLN failed to produce evidence from which a jury could find the requisite link between the actions of the command staff, the creation of the policy, and the implementation of the policy that led to the rejection of PLN materials. The policy did not expressly ban newspapers and magazines or limit books to those from the "big four," which were the practices that led to the First Amendment violations. PLN has not produced any evidence that members of the command staff were the source of these practices. Consequently, there can be no § 1983 claim against the command staff.[16]

### d.    Sheriff Babeu, Deputy Kimble, and Other Defendants

As to Sheriff Babeu and Deputy Kimble, PLN cites no evidence of their personal involvement in the constitutional deprivation. Their role as chief policymakers for the jail does not establish their personal involvement in the First Amendment deprivations for the reasons described above with regard to the command staff. "[Section 1983 liability] arises only upon a showing of personal participation by the defendant. A supervisor is

---

[16] PLN argues that the policy in effect when it sent its materials—which did not expressly ban newspapers and magazines—was hopelessly vague in light of the prior policy which did ban newspapers and magazines. PLN, however, also argues that its rights were violated because mailroom staff thought the policy was to ban newspapers and magazines. PLN cannot have it both ways. There is no evidence the mailroom staff were consulting official policy.

only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Unlike the evidence produced with respect to Sergeant Delgado and Lieutenant Rushing, PLN has not produced any evidence of personal participation or knowledge of the First Amendment violations on the part of Sheriff Babeu and Deputy Kimbel, and thus no § 1983 claim lies against Sheriff Babeu and Deputy Kimble. As for the remaining defendants,[17] there is no evidence of any personal involvement in the events that gave rise to this case. There is accordingly no § 1983 liability for those individuals.

### e.   *Monell* Claim for Pinal County Liability

PLN also seeks to hold Pinal County liable under § 1983. "Congress intended the term 'person' [in § 1983] to include municipalities," such as Pinal County. *Christie v. Iopa*, 176 F.3d 1231, 1234 (9th Cir. 1999). But municipality liability cannot be based in the theory of respondeat superior. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 689-91 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. PLN advances three general theories to justify § 1983 liability under *Monell* for Pinal County: its officials were acting in accordance with a formal policy, its officials followed a practice or custom, and its officials failed to conduct adequate training that would prevent constitutional violations like those suffered by PLN.

Because jail staff acted pursuant to an unconstitutional practice or custom, the Court looks only at that theory. PLN seeks to establish *Monell* liability for Pinal County by claiming that there was a widespread practice and custom that dictated denial of all newspapers and magazines, period, and all books that did not come from four specific publishers. The birth of a custom is the inverse of a policy: "Unlike a 'policy,' which

---

[17] Defendants Johnston, McVicker, Valdez, Chavez, Kelley, Martinez, Arnold, Hawkins, Dennis Rushing, Hull, Gant, McNeely, Hoyos.

comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance or acquiescence in it." *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995). To establish a custom sufficient to create *Monell* liability, the plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). That practice or custom must be "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

The uncontroverted evidence conclusively establishes that, while official policy was mum on newspapers and magazines and what publishers were approved, the de facto policy was to deny all magazines and newspapers and books that were not from four specific publishers. While PLN appears to be the first entity to send in publications, the evidence is uniform that the entire mailroom staff, from detention aides to Sergeants to Lieutenants, believed that newspapers and magazines were banned and books could come from only four publishers. In that sense, there was a stark disconnect between what upper-level prison policymakers believed was policy, and what the lower-level mailroom staff actually carried out. Fault for that disconnect lies with the supervising jail officials in their official capacity, and therefore the county. While the official policy in place during 2011 had eliminated the provision expressly banning magazines or newspapers, jail policymakers did not actually implement that policy. No official training ever took place on mailroom procedures and no direction was ever provided to mailroom supervisors and staff on what materials. PLN's materials were repeatedly denied on an unconstitutional basis. Consequently, the change in the words of the policy had no effect.

Once a plaintiff has provided evidence that municipal employees repeatedly engaged in constitutional violations without reprimand, a municipality may be liable for that custom "irrespective of whether official policy-makers had actual knowledge of the

practice at issue." *Navarro v. Block*, 72 F.3d 712, 714-15 (9th Cir. 1995) (internal quotation omitted). Custom liability "ensures that counties are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official policy-maker 'but are so pervasive as to have the force of law.'" *Hinckley v. Thurston County*, CV-06-3067-JPH, 2008 WL 706702 at *7 (E.D. Wash. Mar. 14, 2008) (quoting *Thompson*, 885 F.2d at 1444), *aff'd sub nom. Hinckley v. Yakima County*, 356 F. App'x 927 (9th Cir. 2009). This is such a case. The mailroom uniformly enforced a policy that (1) banned all newspapers and magazines and (2) allowed books from only four publishers. Defendants have conceded that both practices were unconstitutional. Liability for that ingrained practice of constitutional violations lies with Pinal County.

There is no genuine dispute of material fact that the following individuals and entities are liable under § 1983 for the First Amendment violations: Detention Aides Romero, Hansley-Salisberry, and McBirnie; Sergeant Delgado and Lieutenant Rushing; and Pinal County. Likewise, there is no genuine dispute of material fact that the command staff, Sheriff Babeu, and Deputy Kimble are not liable under § 1983.

### 2.    Due Process

The jail did not provide notice and an opportunity for a publisher to appeal the rejection of its materials. The absence of a notice-and-appeal mechanism violated clearly established constitutional law:

> [T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. . . . The District Court required that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence. These requirements do not appear to be unduly burdensome, nor do appellants so contend. Accordingly, we affirm the judgment of the District Court with respect to the Department's regulations relating to prisoner mail.

*Procunier v. Martinez*, 416 U.S. 396, 417-19 (1974), *overruled on other grounds by*

*Thornburgh v. Abbott*, 490 U.S. 401 (1989); *see Krug v. Lutz*, 329 F.3d 692, 699 (9th Cir. 2003) ("Following *Thornburgh*, this circuit has repeatedly acknowledged that withholding delivery of inmate mail must be accompanied by the minimum procedural safeguards established in *Martinez*.") Accordingly, no qualified immunity attaches and examination of the participation of each group of Defendants in the due process violation is necessary.

### a.    Mailroom Staff

Sergeant Delgado, Lieutenant Rushing, and Detention Aides Romero, Hensley-Salisberry, and McBirnie have § 1983 liability for the due process injury. They were personally involved—each was aware that they were discarding PLN materials. The Detention Aides threw away or sent back all of the materials at the direction of Sergeant Delgado, who went to Lieutenant Rushing and received no guidance. While none of these members of the mailroom staff had any personal involvement in the creation of the deficient policy, they discarded or returned PLN materials, and in doing so provided no opportunity to contest or appeal the non-deliverability decision. Defendants are correct that the mailroom policy itself was constitutionally deficient by not providing an express notice-and-appeal provision, but the mailroom staff filled in the vacuum in a way that violated PLN's due process rights. They cannot claim qualified immunity in light of the longstanding contours of due process rights in the context of prison mail. Accordingly, there is no genuine dispute of material fact that members of the mailroom staff are liable for the due process violation.

### b.    Command Staff

PLN claims that Specialist Linderholm and Cmdrs. Johnson, Valenzuela, and Montano were personally involved in the drafting of the policy. It emphasizes statements by Specialist Linderholm and Deputy Kimble that the command staff had some level of input to the formation of jail policy. (Doc. 87 ¶ 36; Doc. 99 ¶ 36.) As discussed above, and conceded by the Defendants, the absence of a notice-and-appeal mechanism in the mailroom policy was a cause of PLN's due process injury. The question for the command

staff is the extent of their involvement in the drafting of the deficient jail policies. The Parties dispute this point. PLN has cited testimony that the command staff was involved in policymaking to some extent. (*Id.*) From that evidence, a jury could conclude that the Command Staff drafted the mailroom policy and therefore was personally involved in the constitutional deprivation. That creates a genuine dispute of material fact. Summary judgment on this question is therefore inappropriate, and both Parties' motions are denied with respect to the command staff's § 1983 liability for the due process violations.

### c.   Sheriff Babeu, Deputy Kimble, and Pinal County

Defendants have conceded that Sheriff Babeu and Deputy Kimble, as ultimate policymakers, are liable in their official capacities for violating the due process rights of PLN. Liability thus lies ultimately with Pinal County. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Here, Defendants conceded that the due process violation was caused by the defective mailroom policy. Consequently, Pinal County is liable on PLN's *Monell* claim for denying procedural due process.

PLN, however, has produced no facts to establish sufficient personal involvement by Sheriff Babeu and Deputy Kimble to create individual § 1983 liability. Sheriff Babeu delegated authority for running the jail to Deputy Kimble. (Doc. 87 ¶ 33; Doc. 99 ¶ 33.) PLN produced no contrary evidence that Sheriff Babeu was involved in the day-to-day policymaking of the Pinal County Jail. Deputy Kimble was the ultimate policymaker for the jail. (Doc. 87 ¶¶ 34-35; Doc. 99 ¶¶ 34-35.) He has responsibility for jail policies, including the mailroom policy. (Doc. 99 ¶ 36.) That responsibility is sufficient to establish liability in his official capacity. But PLN has not put forth any evidence that Deputy Kimble actually participated in the drafting of the mailroom policy, unlike the evidence cited for the Command Staff. That lack of evidence defeats an effort to establish individual liability. There must be personal participation, and not reliance on "the buck stops here" to establish individual liability. *Cf. McMillian v. Monroe Cnty.*, 520 U.S. 781

(1997) (holding that having "final policymaking authority" establishes liability in an official capacity).

In sum, Pinal County policymakers crafted and enforced a constitutionally deficient mailroom policy that violated PLN's right to procedural due process. With regard to the mailroom staff, there is no genuine dispute of material fact that they are liable for the Due Process violation. But on the other hand, there is no genuine dispute of material fact no § 1983 claim lies against Sheriff Babeu and Deputy Kimble because there is no evidence of personal involvement. Finally, summary judgment is inappropriate on the question of the Command Staff's liability for the due process injury.

## C.    Damages

The Defendants have moved for summary judgment on the issue of damages, claiming that PLN is entitled only to nominal damages. PLN opposed and seeks to proceed to trial on the issue of damages.

"[T]he basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Cmnty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (internal quotations omitted). Compensatory damages "include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering.'" *Id.* at 307. The Parties agree that PLN is not claiming damage from lost income. Defendants seize upon that concession and claim that there is no evidence PLN has suffered any other compensable loss. In response, PLN cites three categories of damage: inability to communicate its message, diversion of resources to investigate constitutional wrongs, and frustration of mission.

### 1.    Lost Opportunity to Communicate

PLN advances a theory of "lost opportunity to communicate its message" as a basis for compensatory damages. The Supreme Court has insisted that courts look only to actual damages, and not engage in abstract weighing of constitutional rights. Damages that "focus, not on compensation for a provable injury, but on the jury's subjective

perception of the importance of constitutional rights as an abstract matter . . . [are] impermissible." *Stachura*, 477 U.S. at 308. On the other hand, it is similarly inappropriate to reject a damage claim just because damages may be difficult to quantify. *See id.* at 310-11 ("When a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate. In those circumstances, presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure.")

In *Stachura*, the Court rejected jury instructions that "called on the jury to measure damages based on a subjective evaluation of the importance of particular constitutional values." *Id.* at 311. In a footnote, the Court observed that its decision did not conflict with the line of cases upholding money damages for a violation of the right to vote. *Id.* at 311 n.14 (citing *Nixon v. Herndon*, 273 U.S. 536 (1927)). At the same time, it struggled to articulate the difference between the concrete and ephemeral with regard to the "right to vote" injury, contradictorily stating that that "value of the right . . . is the money value of the particular loss that the plaintiff suffered—a loss of which each member of the jury has personal knowledge," but that "[i]t is *not* the value of the right to vote as a general, abstract matter, based on its role in our history or system of government." *Id*. at 311 n.14. Ultimately, the Court attributed the award of damages in the right to vote cases to the long line of cases upholding such awards. *See id.* The right to vote line is likely a historical quirk. The modern trend is to require actual damages that can be measured or traditional non-measurable tort damages, such as mental anguish and humiliation. *See Chalmers v. City of Los Angeles*, 762 F.2d 753, 760-61 (9th Cir. 1985).

Viewed in that light, PLN's "lost opportunity to communicate" falls short. One circuit upheld damage awards in limited instances that are based on an organization's "inability to disseminate its views." *City of Watseka v. Ill. Public Action Council*, 796 F.2d 1547, 1558 (7th Cir. 1986), *aff'd* 479 U.S. 1048 (1987). The Ninth Circuit has never countenanced such an award, however, and such a theory seems much closer to assigning

an inherent value to a constitutional right than to compensable injury. In *Brooks v. Andolina*, 826, F.2d 1266 (3d Cir. 1987), the Third Circuit reversed the lower court's determination that a prisoner's unconstitutional placement in punitive segregation for thirty days did not give rise to compensatory damages. In so doing, the Third Circuit noted that "not all elements of damages under the principles of the common law of torts need be proved by specific dollar amounts" but cited as examples mental anguish, humiliation, and pain and suffering—traditional "non-measureable" tort damages. *Id.* at 1270. Lost opportunity to communicate does not involve the traditional tort damages that the *Stachura* Court highlighted. Consequently, that theory cannot support a damages claim.[18]

## 2.    Diversion of Resources

PLN next claims that it suffered damages because it was forced to divert resources away from its core mission to investigate the denial of its materials at the jail. In *Carey v. Piphus*, 435 U.S. 247, 257-59 (1980), the Supreme Court focused on the common law of as the guiding star for determining what damages are available under § 1983. To render compensation to victims, tort law will allow recovery of the value of losses in staff time and resources. *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-06 (9th Cir. 2002) (affirming damage award for "diversion of resources"). PLN has produced evidence that its resources were diverted pre-litigation to investigate and remedy the constitutional violations at Pinal County Jail. (Doc. 121 at ¶¶ 2-5; Doc. 120 at ¶¶ 13-15.) That is sufficient to defeat summary judgment and allow PLN to proceed to trial on a diversion of resources theory.

---

[18] PLN also cites several decisions where compensatory damages were awarded to prisoners where the prison had interfered with their mail. *See, e.g.*, *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003); *Williams v. Brimeyer*, 116 F.3d 351 (8th Cir. 1997). None of those cases actually review the damage award. Furthermore, *Broulette v. Starns*, a case from this Court, involved an award of damages for the confiscation of the prisoner's magazines, whose value was easy to ascertain, not lost opportunity to communicate. 161 F. Supp. 2d 1021, 1029 (D. Ariz. 2001).

### 3.      Frustration of Mission

PLN finally asserts that it has suffered damages because its mission of national education and advocacy for prisoners' rights was frustrated. (Doc. 120 at ¶ 17.) It claims that, as a result of the unconstitutional policies of the jail, it will need to expend resources to counter the policy's adverse effects on prisoners, family, and friends, who believed that such materials were contraband. (*Id.* at ¶¶ 18-19.) The Ninth Circuit has allowed damages on this theory. *See Combs*, 285 F.3d at 905 (affirming "frustration of mission damages, namely for design, printing, and dissemination of literature aimed at redressing the impact Combs' discrimination had on the Marin housing market"). Defendants have not countered the evidence put forward by PLN to justify proceeding on the theory of frustration of mission. Consequently, summary judgment is denied and PLN can advance a frustration of mission theory at trial.

### 4.      Nominal Damages

Where a party's constitutional rights have been violated, an award of nominal damages is mandatory. *Floyd v. Laws*, 929 F.2d 1390, 1402 (9th Cir.1991); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that nominal damages may be awarded without proof of actual injury). Consequently, if nothing else, PLN is entitled to nominal damages.

### 5.      Punitive Damages

Finally, PLN also seeks punitive damages. Punitive damages, however, are not available under 42 U.S.C. § 1983 against "local governing bodies" such as Pinal County. *See Hammond v. County of Madera,* 859 F.2d 797, 803 n.2 (9th Cir. 1988). Consequently, PLN cannot recover punitive damages from Pinal County for its *Monell* claims.

With respect to the individual defendants who are liable under § 1983,[19] punitive

---

[19] The mailroom staff (detention aides, Sgt. Delgado, and Lt. Rushing) for the First Amendment and due process violations, and potentially the Command Staff for the due process violations.

damages are available only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). PLN has produced no evidence that would support such a finding with respect to the individual defendants. Accordingly, the Court grants summary judgment for Defendants on the issue of punitive damages.

## CONCLUSION

Certain Defendants violated PLN's rights under the Fourteenth Amendment. The Jail's past practice of banning all newspapers and magazines, permitting books from only four specified publishers, and failing to provide notice of and an opportunity to appeal a rejection were unconstitutional. Summary judgment is granted for PLN on those points.

The status of the current publisher-only rule remains in question until Defendants file their Notice and the Court issues its subsequent order. Summary judgment on the constitutionality of that policy and PLN's Motion for a Permanent Injunction is therefore deferred. PLN's Motion for Declaratory Relief is denied.

The Court grants summary judgment for PLN on the liability under § 1983 of Detention Aides Romero, Hansley-Salisberry, and McBirnie, Sergeant Delgado, Lieutenant Darrin Rushing, and Pinal County for compensatory damages to PLN for violating its First Amendment and Due Process rights. The Court denies both Parties' Motions for Summary Judgment on the liability of the Command Staff for the Due Process violation. The Court grants summary judgment for all remaining Defendants on the question of § 1983 liability.

PLN may advance damage theories of diversion of resources and frustration of mission at trial, but not inability to communicate its message. Further, no party is liable for punitive damages. Defendants' request for summary judgment on damages is therefore granted in part and denied in part.

**IT IS THEREFORE ORDERED THAT:**

1.      PLN's Motion for Partial Summary Judgment, Permanent Injunction, and

Declaratory Judgment (Doc. 85) is **granted in part, denied in part, and deferred in part.**

2.      Defendants' Motion for Partial Summary Judgment (Doc. 102) is **granted in part, denied in part, and deferred in part.**

3.      PLN's Motion to File a Surreply (Doc. 134) is **DENIED.**

4.      Defendants shall supplement the record **within 14 days** of this Order with evidence on why each category of PLN material is currently allowed into the Jail under its current policy and any criteria on which such decisions were made. PLN shall then have **14 days** to file any Response.

Dated this 19th day of March, 2013.

G. Murray Snow
United States District Judge